# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2018, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Lee Money
Greenwood, Indiana

ATTORNEY FOR APPELLEE

Michael Cheerva
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Elizabeth Ann McQuinn, <br> *Appellant-Petitioner,* <br><br> v. <br><br> Michael Todd McQuinn, <br> *Appellee-Respondent* | February 28, 2018 <br><br> Court of Appeals Case No. 29A05-1707-DR-1637 <br><br> Appeal from the Hamilton Superior Court <br><br> The Honorable William J. Hughes, Judge <br><br> The Honorable William P. Greenaway, Special Judge <br><br> Trial Court Cause No. 29D03-0904-DR-543 |

**Altice, Judge.**

**Case Summary**

This appeal is the latest chapter in the acrimonious and virtually constant litigation that has ensued following the 2010 dissolution of the marriage of Elizabeth McQuinn (Mother) and Michael Todd McQuinn (Father). Mother appeals from the trial court's order disposing of numerous motions filed by the parties. Mother raises several issues, which we restate and reorder as follows:

> 1. Did the trial court abuse its discretion in modifying child custody?

> 2. Did the trial court abuse its discretion in finding Mother in contempt?

> 3. Did the trial court abuse its discretion in declining to impute income to Father?

> 4. Did the trial court abuse its discretion in awarding Father the right to claim tax exemptions for the parties' children?

> 5. Did the trial court abuse its discretion in restricting Mother's significant other from being present during parenting time exchanges and the children's extracurricular activities?

> 6. Did the trial court abuse its discretion in awarding Father attorney fees?

We affirm.

## Facts & Procedural History[1]

Mother and Father have three children: a son, J.M., born in 1999; a daughter, M.M., born in 2001; and another daughter, H.M., born in 2005 (collectively, the Children). Mother filed her dissolution petition on April 16, 2009, and pursuant to a mediated settlement agreement adopted in March 2010, the parties shared joint legal custody of the Children, Mother was awarded physical custody, and Father was awarded parenting time in excess of that set forth in the Indiana Parenting Time Guidelines.

In July 2011, custody was modified to grant Mother sole legal custody of the Children and to provide that the parties would split physical custody equally on alternating weeks. Custody was modified again on July 30, 2013. At that time, Father was granted sole legal and physical custody of J.M. Mother was awarded primary physical custody of M.M. and H.M., and Mother and Father were awarded joint legal custody of the girls. Parenting time was ordered for both parents pursuant to the Parenting Time Guidelines, and it was ordered that all three of the Children were to be together for parenting time. In February 2014, parenting time was modified yet again pursuant to an agreed order, which provided that Mother's parenting time with J.M. would remain

---

[1] We note that Mother's statement of facts contains a number of argumentative statements. We remind Mother's counsel that the statement of facts in an appellate brief should be devoid of argument. *See Minix v. Canarecci*, 956 N.E.2d 62, 66 n.2 (Ind. Ct. App. 2011).

unchanged, but Mother and Father would alternate physical custody of M.M. and H.M. on a weekly basis.

[5] For reasons that are not entirely clear from the record, Mother's relationship with J.M. and Father's relationship with M.M. deteriorated greatly after the divorce, which led to problems with parenting time. Since his sixteenth birthday in July 2015, J.M. has refused to cooperate with parenting time or to see Mother at all. When Mother would come to his school to pick him up, he would avoid her and ride the bus to Father's house. When Father would drop J.M. off at Mother's house, J.M. would leave and walk several miles, even in inclement weather, to Father's or a friend's house rather than stay with Mother. Father imposed various punishments for J.M.'s defiance, all to no avail.

[6] M.M. has also been uncooperative with parenting time with Father. On many occasions, when Father arrived to pick M.M. and H.M. up from Mother's house, M.M. refused to come outside. When Father or his current wife would attempt to pick M.M. up from school, she would often not be present.

[7] Father filed another motion to modify custody on May 31, 2016, as well as a motion for rule to show cause on June 10, 2016. On July 6, 2016, the trial court denied Father's petition to modify, "reaffirm[ed] its prior order of custody in all respects", reminded the parties that they were expected to abide by the court's prior order, and ordered that Father's parenting time with M.M. was to "be restarted immediately." *Appellant's Appendix* at 43. The trial court also found Mother in contempt for failing to provide Father with health insurance

information for the Children as required and ordered her to pay $1,500 of Father's attorney fees as a sanction. On July 7, 2016, Father filed another motion for rule to show cause alleging that Mother had not made M.M. available for parenting time the previous day as ordered.

[8] Thereafter, on August 16, 2016, Mother's significant other, Dewey Price, picked M.M. up from school on a day that Father was scheduled to have parenting time. This led to a confrontation between Father and Price in the school parking lot, which culminated in Price driving away with M.M. and the police being called. On August 18, 2016, Father filed an emergency motion for rule to show cause alleging that Mother had repeatedly defied court orders by concealing M.M. within her home during Father's scheduled parenting time, including following the August 16 incident at M.M.'s school. A hearing was held on August 30, 2016, at the conclusion of which the trial court found Mother in contempt and imposed thirty days incarceration, with five days executed and the remainder suspended. The court further ordered that Father was to immediately exercise forty consecutive days of make-up parenting time with M.M. At the same hearing, the trial court found Price to be in direct contempt for signaling answers to Mother during her testimony, and he was ordered to serve forty-eight hours in jail as a sanction.

[9] Both parties filed numerous additional motions and petitions. Those relevant to this appeal include: Mother's and Father's cross-petitions to modify custody and parenting time, Father's motions for rule to show cause, Father's petition to restrain Mother from having Price present during parenting time exchanges or

at the Children's activities and schools, Father's petition to modify child support and tax exemptions, and Father's request for attorney fees. Following a four-day hearing, the trial court issued its order on all pending matters on July 3, 2017.[2] In its order, the trial court awarded Father sole legal custody and primary physical custody of all three of the Children. Mother was awarded parenting time pursuant to the Guidelines with M.M. and H.M., and two hours of supervised parenting time per week with J.M. The trial court recalculated child support accordingly, and it further granted Father the right to claim the tax exemptions for all three of the Children henceforth. Additionally, the trial court granted Father's request to restrain Mother from having Price present at parenting time exchanges and the Children's schools and activities, and it further found Mother to be in contempt for discussing the litigation with M.M. and for failing to abide by the previous court order regarding tax exemptions for 2014 and 2015. Finally, the trial court ordered Mother to pay $14,000 of Father's attorney fees. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

---

[2] Mother did not include this order in her appendix, instead filing it separately as an addendum to her brief. Thus, we will cite the order separately as follows: *July 3, 2017 Order*. Mother has also failed to include a number of relevant filings in her appendix. *See Wilhoite v. State*, 7 N.E.3d 350, 354-55 (Ind. Ct. App. 2014) (noting that it is the appellant's burden to provide us with an adequate record to permit meaningful appellate review). We are permitted, pursuant to Indiana Evidence Rule 201(a), to take judicial notice of the "records of a court of this state." *See Banks v. Banks*, 980 N.E.2d 423, 426 (Ind. Ct. App. 2012) (explaining that judicial notice may be taken at any stage of the proceedings, including on appeal), *trans. denied*. We have done so where necessary.

[10] Where, as here, the trial court enters findings of fact *sua sponte*, the specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not entered findings. *Brinkmann v. Brinkmann*, 772 N.E.2d 441, 444 (Ind. Ct. App. 2002). The specific findings will not be set aside unless they are clearly erroneous, and we will affirm the general judgment on any legal theory supported by the evidence. *Hanson v. Spolnik*, 685 N.E.2d 71, 76 (Ind. Ct. App. 1997), *trans. denied*. A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it. *Id*. at 76-77. In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id*. at 77. Rather, we consider only the evidence and reasonable inferences drawn therefrom that support the findings. *Id*.

## 1. Custody Modification

[11] Mother first challenges the trial court's decision to modify child custody. We review custody modifications for an abuse of discretion, with a preference for granting latitude and deference to our trial judges in family law matters. *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002). In the initial custody determination, both parents are presumed equally entitled to custody, but a petitioner seeking a subsequent modification bears the burden of demonstrating that the existing custody should be altered. *Id*. When reviewing a trial court's decision modifying custody, we may not reweigh the evidence or judge the credibility of the witnesses. *Browell v. Bagby*, 875 N.E.2d 410, 412 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment

and any reasonable inferences therefrom. *Id.* Importantly, we observe that our court's deference to the trial court's decision to modify custody is "a reflection, first and foremost, that the trial judge is in the best position to judge the facts, to get a feel for the family dynamics, to get a sense of the parents and their relationship with their children—the kind of qualities that appellate courts would be in a difficult position to assess." *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940-41 (Ind. 2005).

[12] Indiana Code § 31-17-2-21 provides that a trial court may not modify a child custody order unless (1) the modification is in the best interests of the child and (2) there is a substantial change in one or more of the factors that the court may consider under I.C. § 31-17-2-8. I.C. § 31-17-2-8 provides that the trial court is to consider all relevant factors,[3] including:

> (1) The age and sex of the child.

> (2) The wishes of the child's parent or parents.

> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

---

[3] In her reply brief, Mother argues that the trial court was prohibited from considering factors other than those specifically enumerated in I.C. § 31-17-2-8. The statute, however, provides that the trial court must consider all relevant factors, including but not limited to those specifically set forth therein. To the extent that the trial court considered additional factors not listed in I.C. § 31-17-2-8, such consideration was not error.

(4) The interaction and interrelationship of the child with:

    (A) the child's parent or parents;

    (B) the child's sibling; and

    (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

    (A) home;

    (B) school; and

    (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

[13] Mother claims that the trial court erred by failing to consider the statutory factors set forth above.[4] In substance, however, she simply argues that the trial

---

[4] To the extent that Mother argues that the trial court should have entered special findings with respect to each factor set forth in I.C. § 31-17-2-8, we note that Mother failed to request special findings. *See In re*

court did not weigh the factors and the evidence as she believes it should have. These arguments are nothing more than requests to reweigh the evidence, which we will not indulge on appeal.

[14] The trial court made the following relevant findings with respect to its decision to modify custody:

> The [C]hildren's age and continued struggles between the parties, among all other factors that the Court may consider, demonstrate a substantial and continuing change in circumstances that render the current custody arrangement unreasonable and no longer in the [C]hildren's best interests. . . .

> The Court finds that changing custody to Father will result in more stability for the children emotionally and that Father is more likely to facilitate meaningful parenting time than Mother. . . .

[15] Mother does not directly challenge these findings, and they are supported by the evidence.[5] In addition to the Children's ages and the increasingly contentious

---

*Marriage of Harpenau*, 17 N.E.3d 342, 347 n.3 (Ind. Ct. App. 2014) (explaining that a trial court modifying custody is not required to enter special findings unless requested by a party).

[5] Mother argues in her Reply Brief that the trial court was prohibited from considering evidence of events taking place before the July 6, 2016 order denying Father's previous petition to modify custody. In support, Mother cites I.C. § 31-17-2-21(c), which provides that a "court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 and, if applicable, section 8.5 of this chapter." As the statutory language makes clear, I.C. § 31-17-2-21(c) does not absolutely restrict the trial court from considering evidence of events occurring before the last custody proceeding—such evidence may be considered if relates to a change in the factors relating to the best interests of the child set forth in I.C. § 31-17-2-8. To the extent the trial court might have considered evidence of events taking place prior to the July 6, 2016 order, it was permitted to do so for the purposes of identifying the parents' and the Children's ongoing patterns of behavior and the current nature of their relationships and interactions. *See also Parks v. Grube*, 934 N.E.2d 111, 117 (Ind. Ct. App. 2010) (finding no error in the consideration of facts occurring before previous

relationship between the parents, the wishes of the parents with respect to custody have also changed, given that both requested modification. Evidence was also presented that the relationship between J.M. and M.M. has suffered under the current custody arrangement—M.M. tends to identify with Mother and J.M. tends to identify with Father, and the hostility between the parents has driven a wedge between the two eldest children. The trial court was within its discretion to conclude that living in different homes every other week has contributed to the rift between J.M. and M.M.[6]

[16] Although M.M. expressed a desire to live with Mother and M.M.'s counselor opined that moving in with Father was very likely to cause M.M. to suffer increased anxiety, the counselor further noted that M.M. had become "more resilient" since she began seeing her in the fall of 2016 and had developed skills to cope with her anxiety. *Appellant's Appendix* at 58. The counselor further opined that the week-on, week-off parenting time schedule was very hard on all of the Children and that M.M. was likely to be "higher functioning" if she lived with Father because Father's home offers more structure and guidance. *Id.* The counselor also stated that she believed Mother and M.M. spoke excessively about court and custody, to the point that the counselor implemented a rule

---

custody order because the evidence was considered "in the context of its *continuing effect* on the Children" (emphasis in original)); *Wiggins v. Davis*, 737 N.E.2d 437, 441 (Ind. Ct. App. 2000) (finding no error in consideration of events occurring before the previous custody order because the events "had a connection to" subsequent events).

[6] Neither party sought to modify custody of J.M.

whereby Mother and M.M. agreed to discuss these issues for no more than five minutes per day.

[17] Additionally, H.M. told the guardian ad litem that she found the current custody arrangement difficult to manage and expressed a desire to live with Father full time. H.M. stated that Mother became angry with her when she said she wanted to live with Father, and one time when they were discussing the issue in the car, Mother slammed on the brakes in middle of traffic and began yelling at her. H.M. further stated that Mother told her "lies" about Father, claiming that Father put Mother in jail and wants to take H.M. away from Mother and never let her come back. *Id.* at 57. H.M. stated that she does not hear Father talk about Mother very much. H.M. also stated that Mother often works too late to help her with her homework and often got her to activities late. H.M. said she would prefer to live with Father because his house is cleaner, she knows her laundry will always be done, she will get to places on time, and because Father and her stepmother are always around to help her with her homework. All of these facts are sufficient to support the trial court's order modifying custody.

## 2. Contempt

[18] Mother next argues that the trial court abused its discretion in finding her to be in contempt. A determination of whether a party is in contempt of court is a matter within the trial court's sound discretion, and we reverse only where there has been an abuse of that discretion. *Richardson v. Hansrote*, 883 N.E.2d 1165,

1171 (Ind. Ct. App. 2008). Our review is limited to considering the evidence and reasonable inferences drawn therefrom that support the trial court's judgment. *Piercey v. Piercey*, 727 N.E.2d 26, 31 (Ind. Ct. App. 2000).

[19] Contempt of court "involves disobedience of a court which undermines the court's authority, justice, and dignity." *Srivastava v. Indianapolis Hebrew Congregation, Inc.*, 779 N.E.2d 52, 60 (Ind. Ct. App. 2002), *trans. denied*. There are two types of contempt—direct and indirect. *Id.* Mother was found to be in indirect contempt, which involves actions outside the trial court's personal knowledge. *In re Contempt of Wabash Valley Hosp., Inc.*, 827 N.E.2d 50, 61–62 (Ind. Ct. App. 2005). "Willful disobedience of any lawfully entered court order of which the offender had notice is indirect contempt." *Francies v. Francies*, 759 N.E.2d 1106, 1118 (Ind. Ct. App. 2001), *trans. denied*.

[20] In its July 3, 2017 order, the trial court found Mother to be in contempt on two separate grounds—for discussing custody issues with M.M. and for failing to abide by the order of the court regarding tax exemptions in 2014 and 2015. Mother challenges both findings, and we address her arguments in turn.

[21] With respect to the first contempt finding, Mother does not dispute that she discussed the litigation with M.M. Indeed, M.M.'s counselor indicated that Mother and M.M. engaged in such discussion so excessively that she found it necessary to institute a rule that M.M. and Mother would be allowed to discuss such matters for no more than five minutes per day. On appeal, Mother argues that no court order prohibited her from engaging in such discussions with M.M.

[22] The trial court determined that Mother was prohibited from discussing the litigation with M.M. under Paragraph 7 of the mediated settlement agreement, which provides as follows:

> 7. Non-disparagement: Each party shall totally and completely refrain from discussing the other with the children except in a manner which is supportive of or complimentary to the other. Each party shall refrain from any effort to alienate the children from the other parent, the absolute aim of the parents is to be a healthy and respectful relationship of the children with each parent. Disputes between the parents regarding the above shall be resolved between themselves and neither shall include the children in these disputes or their resolution.

*Appellant's Appendix Vol. 2* at 5 (emphasis supplied). According to Mother, the last sentence of this paragraph refers only to the subject matter of Paragraph 7— in other words, Mother asserts the language "regarding the above" means that the parents were prohibited only from involving their children in disputes about disparagement or alienation. *Id.* We are unconvinced. Paragraph 7 was part of a larger mediated settlement agreement, and the preceding paragraphs addressed custody and other matters. The phrase "regarding the above" as used in Paragraph 7 encompasses disputes regarding the matters set out in all of those preceding paragraphs. Contrary to Mother's argument on appeal, we see nothing ambiguous or indefinite about the order.

[23] With respect to the contempt finding based on Mother's failure to abide by a court order concerning tax exemptions, we note that at the relevant times, the order regarding tax exemptions provided that Mother would claim M.M. every

year, Father would claim J.M. every year, and Mother and Father would alternate claiming H.M., with Father claiming her in even-numbered years and Mother claiming her in odd-numbered years. Mother concedes that she claimed H.M. in 2014, a year in which Father was entitled to claim her. Mother argues, however, that her actions were not willful. Mother claims that her tax preparer mistakenly claimed H.M., and that once Mother became aware of the mistake, she offered to file an amended return. But by the time of the hearing in this matter, Mother still had not done so. Mother suggests that the onus was on Father to instruct her on how he wanted her to resolve the problem, but the court order regarding tax exemptions spoke for itself.

[24] Mother also argues that the trial court's contempt finding relating to her 2015 tax return is "totally unsupported by evidence and is completely contrary to direct evidence presented to the court." *Appellant's Brief* at 26. In his October 25, 2016 motion for rule to show cause[7] relating to the tax exemptions, Father asserted that his 2015 tax return was rejected because Mother had already claimed J.M. in violation of the court's order. Father also testified to this effect. Nevertheless, Mother directs our attention to Exhibit E, which is a copy of a 2015 tax return prepared on her behalf in which only M.M. is claimed as a dependent. It is apparent, however, that Exhibit E is an amended tax return. Indeed, it is dated November 14, 2016—approximately three weeks *after* Father filed his motion for rule to show cause. Moreover, Exhibit F, a Form 1040X

---

[7] We have taken judicial notice of this motion because it was omitted from Mother's appendix.

Amended Income Tax Return for 2015 prepared on Mother's behalf, is also dated November 14, 2016, and it reflects that the return was amended to "change . . . exemptions for dependents, remove [J.M.]" *Exhibits, Vol. 6*, Respondent's Exhibit F. It is therefore apparent that Mother had claimed J.M. as a dependent in her original 2015 tax return, which does not appear to have been entered into evidence. This was in violation of the court order, which provided that Father would claim J.M. every year. Further, as Mother testified at the hearing, she had not yet filed her amended tax return for 2015. Accordingly, the trial court's contempt finding was supported by the evidence.

### 3. Income Imputation

[25] Mother also argues that the trial court abused its discretion in calculating the parties' respective child support obligations because it declined to impute income to Father based on his current wife's contributions to household expenses. Under the income shares model set forth in the Indiana Child Support Guidelines, the cost of supporting the children is apportioned between the parents according to their means, and the overarching premise is that children should receive the same portion of parental income after a dissolution that they would have received had the family remained intact. *Glover v. Torrance*, 723 N.E.2d 924, 936 (Ind. Ct. App. 2000). A trial court's calculation of child support is presumed valid, and we will review its decision only for an abuse of discretion. *Thompson v. Thompson*, 811 N.E.2d 888, 924 (Ind. Ct. App. 2004), *trans. denied*. An abuse of discretion occurs if the trial court's decision is

clearly against the logic and effect of the facts and circumstances presented or if the court has misinterpreted the law. *Id.*

[26]    "When fashioning a child support order, the trial court's first task is to determine the weekly gross income of each parent." *Ratliff v. Ratliff*, 804 N.E.2d 237, 245 (Ind. Ct. App. 2004). "Weekly gross income" is defined to include not only actual income from employment, but also potential income if the parent is unemployed or underemployed and, as is relevant here, imputed income from in-kind benefits. *Id. See also* Ind. Child Support Guideline 3(A). With respect to in-kind benefits provided by a subsequent spouse, the commentary to the guidelines provides as follows:

> Whether or not income should be imputed to a parent whose living expenses have been substantially reduced due to financial resources other than the parent's own earning capabilities is also a fact-sensitive situation requiring careful consideration of the evidence in each case. It may be inappropriate to include as gross income occasional gifts received. However, regular and continuing payments made by a family member, subsequent spouse, roommate or live-in friend that reduce the parent's costs for rent, utilities, or groceries, may be the basis for imputing income. If there were specific living expenses being paid by a parent which are now being regularly and continually paid by that parent's current spouse or a third party, the assumed expenses may be considered imputed income to the parent receiving the benefit. The marriage of a parent to a spouse with sufficient affluence to obviate the necessity for the parent to work may give rise to a situation where either potential income or imputed income or both should be considered in arriving at gross income.

Child Supp. G. 3(A), cmt. d.

[27] On appeal, Mother argues that under the Guidelines, "[t]o ignore in-kind benefits [in the form of a subsequent spouse's income] is just as erroneous as if a trial court were to ignore a regular paycheck earned from regular and steady employment and find that despite the regular paycheck a parent had no income from that employment." *Appellant's Brief* at 21-22. A review of the relevant case law reveals that the matter is not as clear-cut as Mother would have us believe.

[28] In *Gilpin v. Gilpin*, 664 N.E.2d 766, 767 (Ind. Ct. App. 1996), this court reversed the trial court's child support order due to its failure to consider evidence of the contribution of the mother's subsequent spouse toward the mother's monthly expenses. Specifically, the court reasoned as follows:

> The evidence discloses that Brenda's monthly expenses are approximately $2,400.00. Of this amount, her subsequent spouse contributes one-half, or roughly $1,200.00. Testimony also disclosed that included in this amount is Brenda's subsequent spouse's contribution towards mortgage payments on a house which she owned prior to her remarriage. The trial court improperly failed to consider this evidence in its calculation of Brenda's income for purposes of her petition.

*Id.*

[29] In *Glass v. Oeder*, 716 N.E.2d 413, 417-18 (Ind. 1999), on the other hand, our Supreme Court found no error in the trial court's failure to impute income based on a subsequent spouse's contributions to living expenses. The court noted that the subsequent spouse's contributions presumably freed up

additional money for the support of the children and could properly be considered in calculating the mother's gross weekly income. The court noted further, however, that "the trial court found no imputed income from Oeder's spouse after balancing these factors and others[.]" *Id.* The court found no error in the trial court's weighing of these factors. *Id.*

[30] This court had occasion to address the issue again in *Carmichael v. Siegel*, 754 N.E.2d 619 (Ind. Ct. App. 2001). Although the court reversed on another basis, it nevertheless discussed the mother's subsequent spouse's income because the issue was likely to arise on remand. *Id.* at 630. The court cautioned that "[g]reat care should be taken on remand if the trial court does decide to impute income" based on her subsequent spouse's contributions to her expenses. *Id.* The court discussed *Gilpin* and *Glass*, and provided the following guidance:

> We conclude that when a trial court chooses to impute income to a parent based upon expenses paid by his or her current spouse, there should be some consideration of the parent's historical expenses before remarriage and how much of those expenses have now been assumed by the current spouse. . . .

> If there were expenses being paid by Mother prior to her remarriage that are now being paid by her current husband, that benefit may be considered. In that instance, Mother's remarriage has in fact "freed up" money for child support that was not previously available, and such payments may be imputed as income because they have reduced Mother's cost of living from what it was before remarriage.

*Id.* at 631. Taken together, *Gilpin*, *Glass*, and *Carmichael* make it clear that trial courts have considerable discretion in determining whether to impute income based on a subsequent spouse's income.

[31] Father is a self-employed auto mechanic. In the past, he has made about $1000 per week, but due to economic reversals in the automotive industry, his income has dropped to $529 per week.[8] Father's wife is an attorney, and their joint adjusted gross income for 2015 was $91,041. Mother has not directed our attention to any evidence concerning Father's historical expenses before his remarriage and the extent to which those expenses have been assumed by his wife. Thus, it is unclear whether Father's remarriage has in fact "freed up" additional funds. Indeed, based on the evidence presented, it appears that Father's monthly expenses increased significantly following his remarriage. Specifically, he and his wife purchased a new home and their mortgage payment is approximately $5000 per month. Mother's Exhibit 2 indicates that that Father and his wife's expenses regularly exceed their income, and Father testified that they have had to use a line of credit on their house to pay living expenses.

[32] We must also note that the record reflects that Mother has not paid the mortgage on her primary residence since at least 2012, and she recently inherited a second home, which she testified that she planned to either sell, rent,

_____

[8] Father testified that he is not currently paying himself any income from his business, but he listed this amount as potential income.

or use as a "weekend home" for herself and the Children. *Transcript Vol. 2* at 219. Although Mother has not paid rent or a mortgage for several years, the trial court declined to impute income to her on that basis. *See Glass*, 716 N.E.2d at 417 (affirming the trial court's decision to impute income to the father on the basis that he lived rent-free in his family home, which resulted in reduced living expenses and freed up money for support of the children). It appears to us that the trial court's decision not to impute income to either parent was an attempt to balance the equities in a situation where the precise value of the in-kind benefits each parent received was uncertain. Such balancing is a matter squarely within the trial court's discretion, and we will not second-guess its decision in that regard.

### 4. Tax Exemptions

[33]    Mother also argues that the trial court abused its discretion in granting Father the right to claim all three of the Children as exemptions on his income tax returns going forward. Specifically, Mother argues that trial court failed to consider the relevant factors set forth in in the Indiana Child Support Guidelines. Child Support Guideline 9 provides, in relevant part, as follows:

> Development of these Guidelines did not take into consideration the awarding of the income tax exemption. Instead, it is required [that] each case be reviewed on an individual basis and that a decision be made in the context of each case. . . .
>
> A court is required to specify in a child support order which parent may claim the child(ren) as dependents for tax purposes.

In determining when to order a release of exemptions, it is required that the following factors be considered:

(1) the value of the exemption at the marginal tax rate of each parent;

(2) the income of each parent;

(3) the age of the child(ren) and how long the exemption will be available;

(4) the percentage of the cost of supporting the child(ren) borne by each parent;

(5) the financial aid benefit for post-secondary education for the child(ren);

(6) the financial burden assumed by each parent under the property settlement in the case; and

(7) any other relevant factors, (including health insurance tax subsidies or tax penalties under the Affordable Care Act).

[34]  Mother argues that the trial court's failure to enter findings explaining its decision to award the exemptions to Father amounts to reversible error. We again note that in the absence of a Trial Rule 52 request, the trial court was not required to enter special findings and conclusions thereon. If Mother wished to have specific findings, she should have requested them. Further, in reviewing a general judgment, we will presume the trial court followed the applicable law

and affirm if its decision can be sustained on any legal theory consistent with the evidence. *Sims v. Sims*, 770 N.E.2d 860, 864 (Ind. Ct. App. 2002).

[35]  Although most of the specific factors set forth in Child Support Guideline 9 would appear to support apportioning at least some of the tax exemptions to Mother, the Guideline specifically provides that the trial court may consider "any other relevant factors" and that each case should be considered on an individual basis. In this case, Father is now the primary physical custodian of all three of the Children, and Mother has demonstrated an unwillingness or inability to abide by court orders splitting and/or alternating the tax exemptions. Under these circumstances, we cannot conclude that the trial court's decision to award the right to claim the tax exemptions to Father was an abuse of discretion.

### 5. Mother's Significant Other

[36]  Mother also argues that the trial court abused its discretion in restricting Price from being present at parenting time exchanges, school pick-ups and drop-offs, and the Children's extracurricular activities. Mother cites no authority in support of her argument that such restrictions exceeded the trial court's authority, and her argument in this regard is therefore waived. *See McCollough v. Noblesville Sch.*, 63 N.E.3d 334, 346 (Ind. Ct. App. 2016) (finding appellate claim waived for failure to cite relevant authority or make cogent argument), *trans. denied*.

[37] Waiver notwithstanding, Mother's argument fails. "In all parenting time controversies, courts are required to give foremost consideration to the best interests of the child." *A.G.R. ex rel. Conflenti v. Huff*, 815 N.E.2d 120, 125 (Ind. Ct. App. 2004), *trans. denied*. The trial court's resolution of such issues will be upheld if the record reveals a rational basis supporting the decision. *Id.* at 124-125 (upholding a trial court's order prohibiting the father from encouraging or allowing the child to participate in holiday-related activities that conflicted with the tenets of the child's and custodial mother's religion).

[38] As an initial matter, we note that in her issue statement, Mother characterizes the order as "prohibiting [Price] from any contact with the [C]hildren[.]" *Appellant's Brief* at 34. This is a misstatement of the order; rather, the trial court has ordered that Mother is not to permit Price to be present at parenting time exchanges, school pick-ups and drop-offs, and the Children's extracurricular activities. In other words, the trial court has prohibited Mother from allowing Price to be present at times when Father is also likely to be present, along with the Children. Given the long history of conflict between Father and Price in such situations and the obvious potential for harm to the Children resulting therefrom, these restrictions were reasonable, and they do not amount to an undue restriction on Mother's parenting time.[9] Mother's assertion that these

---

[9] Mother also appears to take issue with the trial court's order jailing Price for direct contempt for signaling answers to Mother during her testimony at a hearing on August 30, 2016. Mother lacks standing to challenge the trial court's order holding someone else in contempt. Furthermore, to the extent Mother argues that the restrictions the trial court placed on Price were an additional punishment for his prior contempt, we find nothing in the record to support such an assertion. Although the trial court mentioned Price's prior

restrictions were in excess of what Father had requested is also inaccurate,[10] and in any event, Mother has not directed our attention to any authority suggesting that the trial court is limited to ordering only such restrictions as have been requested by the parties. Mother has not established reversible error in this regard.

### 6. Attorney Fees

[39] Finally, Mother challenges the trial court's award of attorney fees. In post-dissolution proceedings, a trial court may order a party to pay a reasonable amount toward the opposing party's attorney fees. *Bessolo v. Rosario*, 966 N.E.2d 725, 733 (Ind. Ct. App. 2012), *trans. denied*. Trial courts have broad discretion in awarding attorney fees, and their decisions will be reversed only when they are clearly against the logic and effect of the facts and circumstances before the court. *Id.* In assessing attorney fees, the trial court may consider such factors as the parties' resources, their relative earning ability, and other factors bearing on the reasonableness of the award. Further, any misconduct by a party that directly results in the other party incurring additional attorney fees may be taken into account. *Id.*

---

contempt in entering the relevant restrictions, it did so to provide an example of the ways in which Price has behaved inappropriately with respect to these proceedings. Price's behavior both in and out of court is relevant and provides ample support for the trial court's restrictions.

[10] Because Mother omitted Father's request to restrict Price's presence from her appendix, we have taken judicial notice thereof.

[40] Here, the trial court explained the reasons behind its decision to award attorney fees. Specifically, the trial court found that "based upon the parties' respective incomes as well as multiple contempt findings against Mother in this matter, and numerous continuances requested by Mother to which Father objected, the Court orders the Mother to be responsible for Father's attorney fees which have been incurred in the amount of $14,000.00." *July 3, 2017 Order*, ¶ 22. Mother argues that these fees are excessive and unreasonable. We are unconvinced.

[41] The trial court may consider a number of factors in determining the reasonableness of a fee, but the hours worked and the rate charged are a common starting point. *Cavallo v. Allied Physicians of Michiana, LLC*, 42 N.E.3d 995, 1009 (Ind. Ct. App. 2015). Further, trial court judges possess personal expertise that they may use to determine reasonable attorney fees. *Masters v. Masters*, 43 N.E.3d 570, 577 (Ind. 2015). At the hearing on May 23, 2017, Father's attorney testified that since July 2016, he had worked 42.4 hours on the case at a rate of $300 per hour, resulting in a bill totaling $12,720.00 at that time. It appears that the $14,000 amount awarded by the trial court took into account the fact that the hearing continued on June 13, 2017 and resulted in the accumulation of additional fees.

[42] Mother argues that this award must be reversed because no evidence was presented concerning the reasonableness of the fees. As noted above, however, trial judges have personal expertise on such matters, and Mother did not cross-examine Father's counsel or dispute the reasonableness of the fees requested at the hearing. Even more telling, however, is Mother's own request for attorney

fees, which the trial court denied. Mother's counsel filed an affidavit asserting that he had worked 68.8 hours on the case at a rate of $250 per hour, resulting in a total fee of $17,200.00. Mother's counsel averred that his hourly rate was reasonable and that the amount of time expended on the case was necessary and justifiable. Mother's argument that the trial court's award of $14,000 in attorney fees to Father is unreasonable rings hollow in light of her own request for attorney fees in the amount of $17,200.

[43] Mother also attempts to downplay her own conduct that caused Father to incur additional attorney fees, asserting that "only two" contempt findings were made and that Father had to file only "a single pleading" to compel discovery and that Father's motion to quash overly broad discovery was likewise "a single pleading." *Appellant's Brief* at 31. These arguments are merely requests to reweigh the evidence. Nevertheless, we note that in addition to the two contempt findings made in the July 3, 2017 order, Mother was found in contempt on July 5, 2016, for failing to provide Father with proof of insurance coverage for the Children and ordered to pay $1,500 of Father's attorney fees as a sanction. Mother was again found in contempt on August 30, 2016, this time for interfering with Father's parenting time with M.M., and she was incarcerated and ordered to pay $750 of Father's attorney fees as a sanction. As for Mother's arguments concerning the effort Father's counsel was required to expend to resolve discovery disputes, we note that Mother does not take into account the time counsel presumably spent attempting to resolve such matters

without the intervention of the court. Further, Mother does not dispute that she requested several continuances.

[44] Mother earns far more money than Father and is consequently more capable of paying attorney fees, and her own misconduct and dilatory tactics directly resulted in Father incurring additional attorney fees. Further, Mother has not established that the amount awarded is unreasonable. Under these facts and circumstances, we cannot conclude that the trial court's attorney fee award was an abuse of discretion.

[45] Judgment affirmed.

[46] May, J. and Vaidik C.J., concur.